OPINION *Page 2 
{¶ 1} Defendant-appellant Deitrah Kelly appeals her conviction in the Alliance Municipal Court on one count of assault and one count of resisting arrest. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE {¶ 2} On September 25, 2006, Appellant was engaged in a physical altercation with Terry Barker, while visiting her brother's home. Appellant was at the home to visit her brother, his wife and their daughter. At the same time, Terry Barker, his mother Fonda Barker, father Spencer Barker and fiancée Aleisha Crawford with their daughter, were visiting his sister, Appellant's sister-in-law.
 {¶ 3} Appellant was subsequently charged with two counts of assault, in violation of R.C. 2903.13(A), misdemeanors of the first degree, and one count of resisting arrest, in violation of R.C. 2921.33(A), a misdemeanor of the second degree. The matter proceeded to a jury trial on February 1, 2007. Appellant was found guilty of one count of assault and one count of resisting arrest, and found not guilty of the second count of assault. The trial court sentenced Appellant to ten days in prison, a $250 fine and anger management classes.
 {¶ 4} Appellant now appeals, assigning as error:
 {¶ 5} "I. THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 6} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact *Page 3 
clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, citing State v.Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, syllabus 1.
 {¶ 7} Appellant was charged with assault, in violation of R.C.2903.13(A), which states:
 {¶ 8} "(A) No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn."
 {¶ 9} Appellant argues the evidence introduced at trial demonstrates she herself was the victim of assault, and her actions were consistent with her attempt to defend herself.
 {¶ 10} At trial in this matter, Terry Barker testified:
 {¶ 11} "Q. Okay. What happens?
 {¶ 12} "A. Well, we knock on the door. Jassen lets us in. We go in there. They're all in the living room sitting down. We walk into the living room and Jassen starts yelling stuff about someone took his money. And then him and my dad sort of got into like a little argument. And then Deitrah got into it.
 {¶ 13} "Q. Was that a physical argument or verbal?
 {¶ 14} "A. Verbal. *Page 4 
 {¶ 15} "Q. What was being said back and forth?
 {¶ 16} "A. I'm not too for sure — I can't really remember what they said.
 {¶ 17} "Q. Okay. How long did it go on?
 {¶ 18} "A. Probably about five minutes at the most.
 {¶ 19} "Q. Voices raised?
 {¶ 20} "A. Oh, yeah. They was yell'n.
 {¶ 21} "Q. What did you say, if anything?
 {¶ 22} "A. I just told them not to be yell'n at my dad because his health is not that good.
 {¶ 23} "Q. What's wrong with him?
 {¶ 24} "A. Huh?
 {¶ 25} "Q. What's wrong with him?
 {¶ 26} "A. Oh, has diverticulitis and he's a full-blown diabetic and all that stuff. That's all I really know. Anyways I told them not to be yell'n at him and stuff. And then she jumped up and come up and got in my face. And I stuck my hand up trying like pulled her back away from me.
 {¶ 27} "Q. Now, when you say she got in your face, who were you referring to?
 {¶ 28} "A. Deitrah.
 {¶ 29} "Q. How close to your face did she get?
 {¶ 30} "A. Pretty close.
 {¶ 31} "Q. What was she saying.
 {¶ 32} "A. I don't know, I can't really remember that either. But, she was just like yell'n and scream'n. Cause everybody was just yell'n and scream'n at that moment. *Page 5 
 {¶ 33} "Q. Okay.
 {¶ 34} "A. And she just kept on gett'n closer and closer. So I stuck my hand up to hold her back.
 {¶ 35} "Q. Was it your right hand like you're doing now?
 {¶ 36} "A. I think I used both hands.
 {¶ 37} "Q. Okay.
 {¶ 38} "A. But once I did that, then it just started swing'n, scratch'n, push'n.
 {¶ 39} "Q. Who?
 {¶ 40} "A. Deitrah.
 {¶ 41} "Q. At who?
 {¶ 42} "A. At me.
 {¶ 43} "Q. Did you strike out at her?
 {¶ 44} "A. No.
 {¶ 45} "Q. Did you attempt to leave or retreat or back up?
 {¶ 46} "A. Yeah, I was trying to get away from her. When I finally did get away from her, I ran out the door, got in the van.
 {¶ 47} "Q. How long was the physical confrontation between you and Deitrah?
 {¶ 48} "A. Probably ten minutes, fifteen minutes.
 {¶ 49} "Q. That you, that you — that she was swinging?
 {¶ 50} "A. Yeah, I was like totally trying to fight to get out of there. Like one moment I was on the couch, my back on the couch and then I was holding my feet up, my hands out try'n to get away and she like trying to bite my fingers and stuff as I was trying to push her off me. And then finally my mom got up there and got between us *Page 6 
and kind of separated us. After that she had my shirt and I just ripped my shirt and I started running away and I just ripped my shirt right off. So I just ran outside and got in the van.
 {¶ 51} "Q. Where'd you go?
 {¶ 52} "A. Huh?
 {¶ 53} "Q. Where'd you go?
 {¶ 54} "A. I got in the van. Then everybody else came out and we came up to the police station.
 {¶ 55} "Q. Directly?
 {¶ 56} "A. Yep."
 {¶ 57} Tr. at 25-28.
 {¶ 58} The State then introduced photographs demonstrating injuries Terry Barker sustained during the incident in question.
 {¶ 59} Fonda Barker, Terry Barker's mother, then testified at trial:
 {¶ 60} "Q. Okay. Describe what "Everything went", what happened?
 {¶ 61} "A. Dee jumped up and said that she didn't want nobody jumping on her brother. And nobody, the only thing he said to Jassen was that he didn't want him yelling at his dad like a dog. Nobody went after Jassen. Nobody said nothing, you know, like that.
 {¶ 62} "Q. And where was Ms. Kelly when she was saying this?
 {¶ 63} "A. In the middle of the front room.
 {¶ 64} "Q. And where was your son?
 {¶ 65} "A. In the doorway. *Page 7 
 {¶ 66} "Q. Then what happened?
 {¶ 67} "A. I can't recall if anything was every [sic] said or anything, but Dee-Deitrah went up to my son and like pushed him with her chest. And it looked like he kinda like stood back and put his hands up there so, you know, she couldn't hit, you know, push him with her chest anymore. Being in his face and stuff and then I don't exactly remember what happened after that cause it just.
 {¶ 68} "Q. What did you see?
 {¶ 69} "A. All I remember is I'm in the middle between Dee and Terry saying, "You'ins don't want to fight, you don't want to fight. No fighting. Come on."
 {¶ 70} "Q. And what was going on between the two of them at that point?
 {¶ 71} "A. I really can't tell you that because all I can tell you is I was in front of Dee. He was behind me. She had a hold of him, holding his shirt or something. And I'm trying to tell them, "No fighting, no fighting. Come on guys. No fighting." And we ended up laying on the love seat. Terry underneath me and Dee on top of me. And I, just telling them, "No fighting, don't fight, don't fight."
 {¶ 72} "Q. You're saying he was on the . . .
 {¶ 73} "A. He was underneath me on the love seat or the couch or whatever that was behind us.
 {¶ 74} "Q. And where was she?
 {¶ 75} "A. On top of me like.
 {¶ 76} "Q. What was she doing?
 {¶ 77} "A. I really couldn't even see her hands. All I could just say is I was looking at her, trying to look at her face." *Page 8 
 {¶ 78} Tr. at 71-73.
 {¶ 79} Appellant was further charged with resisting arrest, in violation of R.C. 2921.33(A), which states:
 {¶ 80} "(A) No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another."
 {¶ 81} Specifically, Appellant argues she was merely upset over her having been arrested.
 {¶ 82} Officer Seth Busche of the Alliance Police Department testified at trial relative to the events surrounding Appellant's arrest:
 {¶ 83} "Q. Okay. What do you do when you don't find her at the Haines Avenue address?
 {¶ 84} "A. DD informed us that her home residence was right around the corner at 125 West Columbia. So we walked around the corner and tried to make contact with her there. While we were on the front porch at that residence, the defendant showed up with another individual. I'm not sure who the other individual was. I never spoke with `em. And I asked her her name. She identified herself. I read her her rights, informed her of her rights. And at that time was when she got real angry, real frustrated.
 {¶ 85} "Q. Okay, just the same.
 {¶ 86} "A. Okay.
 {¶ 87} "Q. Was this on the, on the porch or on the sidewalk? In the street, I guess?
 {¶ 88} "A. It was on the sidewalk right in front of the 125. *Page 9 
 {¶ 89} "Q. Okay. There was someone in a vehicle did you say? Or somebody was walking?
 {¶ 90} "A. There was two individuals that got out of the vehicle they were in. It was Deitrah Kelly and another individual, another female. I'm not sure who the other female was.
 {¶ 91} "* * *
 {¶ 92} "Q. All you asked was her name?
 {¶ 93} "A. Yeah, I did ask her her name.
 {¶ 94} "Q. Did you — were you in uniform?
 {¶ 95} "A. Yes, I was in uniform.
 {¶ 96} "Q. And after you, she told her name, what did you say?
 {¶ 97} "A. I — she started to ask what we're there for, what I wanted to know her name for. What I was asking her name for. And I simply told her, you know, let me advise you of your rights. And I started to read her her rights. And as I was reading her her rights is when she got really upset.
 {¶ 98} "Q. How do you know that she was upset?
 {¶ 99} "A. She had a cell phone in her hand. She slammed the cell phone on the sidewalk and broke it on the sidewalk. She screamed really loud, "No one is going to fucking arrest me," to myself and the other officer.
 {¶ 100} "Q. When you say really loud, what do you mean by that?
 {¶ 101} "A. She was yelling.
 {¶ 102} "Q. What do you do at that point? *Page 10 
 {¶ 103} "A. At that point in time when she started getting real upset and yelling, I attempted to grab a hold of her wrist to place her in handcuffs and she yanked her hand away from me and said, "I'm not going anywhere." And then she just started tensing up and squeezing up her hands and keeping her hands in front of her. She was still verbally and emotionally upset, screaming and hollering and crying, upset.
 {¶ 104} "Q. What were you saying?
 {¶ 105} "A. I just kept yelling to her to stop resisting, stop resisting, you know. "Put your hands behind your back, stop resisting."
 {¶ 106} "Q. Where was Officer Palozzi at that point?
 {¶ 107} "A. Officer Palozzi at that point in time attempted to get a hold of her other wrist and pull her other wrist behind her back. Each of us pulled a wrist behind her back and put the handcuffs on her.
 {¶ 108} "Q. Now how do you pull, pull a wrist behind the back? Put your arms up and show me what you do.
 {¶ 109} "A. Well when she was standing, she was holding her hands in front of her. And I grabbed a hold of her arm to pull this arm behind her back. And Offcer Palozzi pushed her other arm behind her back so we could get the cuffs on her hands, behind her back.
 {¶ 110} "Q. How long did it take to effect that maneuver?
 {¶ 111} "A. Not very long. Maybe — guessing — would be maybe twenty seconds, thirty seconds.
 {¶ 112} "Q. Did you have to use force to do that? *Page 11 
 {¶ 113} "A. She's a strong girl, yeah. It took a lot of strength to hold one of her arms to get a handcuff on her hand.
 {¶ 114} "Q. Do you put any kind of a maneuver or something, like a?
 {¶ 115} "A. No. You can — to call it a maneuver, there's no name for a maneuver.
 {¶ 116} "Q. Okay.
 {¶ 117} "A. But, you know, you can grab a hold of a hand and you can pull it behind a person. I'm not, really there's no name for the maneuver, per say.
 {¶ 118} "Q. You didn't need to use any implementation in addition to your own force?
 {¶ 119} "A. No.
 {¶ 120} "Q. Okay. Once the hands were behind her back, did you have any difficulty handcuffing her?
 {¶ 121} "A. Yeah, she wouldn't cooperate at all. Our vehicles were up at the other end of the block, up in front of 236 Haines, which is just around the corner from where we were. And she kept screaming saying that we had to bring a cruiser down to her. She wasn't walking up to the cruiser. Well, we weren't going to leave her there, leave one officer there with her and go and get another cruiser. So we both walked her up, holding onto her. Each one of us holding onto an arm. And she was just fighting, not really fighting, but just not she wasn't being compliant at all."
 {¶ 122} Tr. at 109-113.
 {¶ 123} Based upon the above, we find there was competent, credible evidence to support Appellant's convictions, and the trier of fact did not lose its way in so finding. The evidence demonstrated Appellant's confrontation with Terry Barker was not an act *Page 12 
of self-defense. Further, the testimony offered by Officer Busche demonstrated Appellant's actions constituted resisting arrest.
 {¶ 124} Appellant's convictions in the Alliance Municipal Court are affirmed. By: Hoffman, J. Gwin, P.J. and Delaney, J. concur *Page 13 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, Appellant's convictions in the Alliance Municipal Court are affirmed. Costs assessed to Appellant. *Page 1